# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EVE COSTOPOULOS,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>MARTIN SHKRELI,<br><br>　　　　　Defendant. | Civil No.:<br><br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Eve Costopoulos ("Plaintiff" or "Ms. Costopoulos"), by and through her counsel, Hach Rose Schirripa & Cheverie, LLP ("HRSC"), as for her claims[1] in this action against Defendant Martin Shkreli ("Defendant Shkreli" or "Mr. Shkreli") hereby alleges as follows:

## PRELIMINARY STATEMENT

1.　　Vyera Pharmaceuticals, LLC f/k/a Turing Pharmaceuticals, LLC ("Turing" or the "Company") was founded by Martin Shkreli in 2014.  By December 2015, the Company found itself at the center of a series of very public controversies and plagued with internal turmoil – all a result of the actions of a single person, Defendant Shkreli.

2.　　Defendant Shkreli has, through today, believed and acted as though Turing was under his control.  He is the largest shareholder of the Company.  Owning 30% of the voting shares of Turing in his name, and controlling, with proxies, approximately 46% of the voting shares, Defendant Shkreli has tried to maintain, either directly or indirectly, control over the Company

---

[1] The claims asserted against Defendant Shkreli were originally asserted in arbitration pending before JAMS but were dismissed without prejudice and refiled in this Court.

through those individuals at the Company who have remained loyal and beholden to him from Turing's early days.

3.      Defendant Shkreli continued his efforts to exert control over Turing's day-to-day even after he was arrested and indicted on charges of securities fraud in December 2015.

4.      Ms. Costopoulos was originally hired by Defendant Shkreli as the Chief Compliance Officer and reported directly to him until the time he was indicted.  Throughout her employment, Plaintiff's professional and ethical duties required her to act in the best interests of the Company and to support the Board and the Chief Executive Officer.  Conscious of her obligations to the Company and its shareholders, Plaintiff employed and followed vigorous due diligence procedures throughout her employment at Turing, relying on the advice of outside counsel and independent analysis, to the extent necessary, in making informed decisions and providing advice that was in the best interests of Turing and its Board.

5.      Unfortunately, the interests of Defendant Shkreli, as well as those of others, did not necessarily coincide with the best interests of the Company.

6.      After being forced to resign as Chief Executive Officer ("CEO") in December 2015 and as a Director of Turing by early 2016, Defendant Shkreli saw his influence at the Company waning.  As a result, he undertook a campaign of harassment and character assassination against Plaintiff, both internally via email, as well as publicly on social media platforms such as Facebook. Beginning in September 2016, he threatened her employment on multiple occasions, took to public forums to make false and untrue accusations against her by name, and maligned her name in the legal and pharmaceutical professional communities.  These actions by Defendant Shkreli caused Plaintiff to suffer damages as set forth herein.

7.     On June 21, 2017, Defendant Shkreli succeeded in installing five close and loyal Shkreli-supporters to Turing's Board of Directors.

8.     Ron Tilles ("Mr. Tilles"), who was the Company's CEO until he was terminated by the Board of the Company in April 2017, remained a Director.   Kevin Mulleady ("Mr. Mulleady"), who had previously been employed at the Company and had been terminated by Mr. Tilles and denied demands of additional compensation and severance by Claimant thereafter, was one of the newly elected Directors.

9.     That same day, Defendant Shkreli posted on Facebook "Make Turing Great Again. Drain the swamp."

10.     On June 22, 2017, the very next day after Defendant Shkreli's Facebook post to "Drain the Swamp," Ms. Costopoulos was stripped of all duties and authority in her capacity as Senior Vice President, Chief Compliance Officer and General Counsel of Turing.  Mr. Mulleady, acting on behalf of the Company, at the direction of Defendant Shkreli and his personal attorney, Mr. Scott Vernick of Fox Rothschild ("Mr. Vernick"), advised Plaintiff that she was being placed on administrative leave pending an investigation into unspecified misconduct.  A company-wide memorandum was circulated announcing the same.

11.     With the placement of Ms. Costopoulos on administrative leave pending an investigation and announcing announcement of that action to the Company, Defendant Shkreli's was a step closer to achieving the ultimate retaliation against Plaintiff – embarrassing her both internally at Turing, as well as in the professional community of which she was a part.  Plaintiff soon learned that she was being accused of having somehow "ordered" the destruction of internal company documents and failing to engage a third-party to investigate an instance of sexual harassment which she and others witnessed first-hand.

12.     Ms. Costopoulos was provided no information about what the Company was doing in order to clear her name or address these unfounded accusations until July 19, 2017, when Plaintiff cooperated with an informal interview regarding the allegations levied against her.  The interview was conducted by law partners of Mr. Vernick.

13.     As will be made abundantly clear below, the accusations against Ms. Costopoulos are false and complete fabrications conjured up to serve as a predicate for terminating Plaintiff's employment, a mission undertaken by Defendant Shkreli subsequent to his forced resignation as CEO – as detailed more thoroughly below.

14.     Having endured the contempt and threats of the vindictive, vengeful and unprofessional Defendant Shkreli for over 18 months, culminating with the accusations being levied against her, on July 20, 2017 Ms. Costopoulos resigned her position at Turing for Good Reason pursuant to the terms of her Employment Agreement.

15.     Ms. Costopoulos cited numerous valid reasons provided for in her Employment Agreement for such action, including that as of June 23, 2017, Plaintiff's duties as Chief Compliance Officer and General Counsel were completely stripped from her, constituting a material diminution of her authorities and responsibilities at Turing; that the diminution of Ms. Costopoulos' duties, responsibilities and authorities was and remains without any proper justification; and that Ms. Costopoulos has been subjected to a continued pattern of harassment (certain instances of harassment have detailed internal company business, which has been broadcast via social media and over Company email).

16.     Just four days after resigning her position at Turing for Good Reason, on July 24, 2017, Ms. Costopoulos was unceremoniously terminated from her position as Senior Vice President and General Counsel of Turing *for Cause*.

17.     As previously mentioned, since being forced to step down as the Company's CEO, Defendant Shkreli made it his goal to publicly humiliate, defame and discredit the accomplishments and integrity of Plaintiff.

18.     For example, as set forth below, Defendant Shkreli sent numerous harassing emails to Ms. Costopoulos, copying other Turing employees.  These emails, which are accusatory in nature, even go as far to insinuate that Ms. Costopoulos was engaged in criminal misconduct.

19.     Moreover, on multiple occasions, Defendant Shkreli posted these false accusations publicly on Facebook, again insinuating that Ms. Costopoulos committed fraud and should be sent to jail.

20.     As a result of Defendant Shkreli's defamatory conduct, Plaintiff has suffered damages.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

22.     Venue properly lies in the Southern District of New York pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, specifically at Turing's New York headquarters, located at 600 3rd Avenue, New York, New York 10016.

## PARTIES

23.     Plaintiff is the former Chief Compliance Officer ("CCO"), Senior Vice President and General Counsel of Turing.  At all relevant times, Plaintiff was an employee of Turing pursuant to her Employment Agreement, up to and until the time of her resignation for Good Reason, and

subsequent termination For Cause, in July 2017.  Ms. Costopoulos is a resident of the State of New Jersey.

24.     Defendant Martin Shkreli is the Founder of Turing.  Mr. Shkreli is the former CEO and a former Director of Turing.  Mr. Shkreli was forced to resign both positions following his arrest and indictment on securities fraud charges in December 2015.  He has since been tried and found guilty of violations of federal securities laws.  Mr. Shkreli is a resident of the State of New York but is currently serving out his seven-year prison sentence at a federal correctional facility in New Jersey.

## FACTS

## I.     FACTUAL BACKGROUND

### A.     *Turing Pharmaceuticals*

25.     Turing Pharmaceuticals was founded by Defendant Shkreli in late 2014. Mr. Shkreli personally owned, and continues to own, approximately 30% of the Company's outstanding common voting shares.[2]  The company was started with three drugs which were acquired from his former company, Retrophin Inc. ("Retrophin").[3]  Because development, approval and marketing of new drugs, even generic drugs, is an expensive process, the business was intended to obtain rights to out-of-patent medicines and reevaluate the pricing of each in pursuit of windfall profits for the Company.  Defendant Shkreli conveyed to Plaintiff, and others, that the profits from these ongoing operations would be used to finance research efforts relating to the development of drugs for rare diseases.

---

[2]     By way of voting proxies from other shareholders in Turing, Mr. Shkreli controls over 46% of the voting power of Turing shares.
[3]     The three drugs that Turing purchased from Retrophin were an intranasal version of ketamine for depression, an intranasal version of oxytocin, and Vecamyl for hypertension.

26.     In addition to Defendant Shkreli, there were also other early investors who identified themselves as "co-founders" of Turing.  These individuals included Patrick Crutcher ("Mr. Crutcher"), Michael Smith ("Mr. Smith"), Edwin Urrutia ("Mr. Urrutia") and Mr. Mulleady. Each of these individuals also worked, in some capacity or another for the Company during all or part of the 2015-2017 period.[4]

27.     In August 2015, Mr. Shkreli acquired the drug Daraprim from Impax Laboratories for $55 million.  At the time, Daraprim was indicated for use to treat toxoplasmosis and malaria. When used in conjunction with leucovorin and sulfonomide, it was intended to treat patients with toxoplasmosis.

28.     Almost immediately thereafter, Defendant Shkreli increased the price of Daraprim from $13.50 per pill to $750 per pill – an overnight price increase of over 5,000%.   Consumers, Attorneys' General, Congress, Medical Associations, patients and healthcare professionals alike publicly criticized Defendant Shkreli's action immediately and unanimously.

29.     Public outcry demanding that the price be returned to "pre-Shkreli" levels was deafening.  This demand appeared to have an impact on Defendant Shkreli who announced in late September 2015 that the price of Daraprim would be decreased – albeit by an unspecified amount. However, in November 2015, he reversed his position and refused to lower the $750 per pill price tag.

---

[4]     Mr. Urrutia worked, among other positions, as the interim CFO of Turing, until he resigned in mid-2016 amid sexual assault allegations brought by a co-worker; Mr. Crutcher served as the head of Business Development, an area in which Mr. Smith was also involved; and Mr. Mulleady was a Managing Director at Turing until he was terminated by Mr. Tilles in 2016.  Mr. Mulleady returned to the Company and was elected to the Board of Directors in June 2017 after being nominated by Defendant Shkreli.

30.     Congress subpoenaed Defendant Shkreli to testify before the Committee on Oversight and Government Reform of the United States House of Representatives. On February 4, 2016, Mr. Shkreli appeared before the Committee, and other than confirming his name, Mr. Shkreli, accompanied by Turing's then Chief Commercial Officer, Nancy Retzlaff ("Ms. Retzlaff"), refused to answer any of the Congressmen's questions, asserting his Fifth Amendment Rights.

31.     That same day, Defendant Shkreli, tweeted the following about the members of the House Committee: "Hard to accept that these imbeciles represent the people in our government."

**B.**     *Ms. Costopoulos Interviews at and Joins Turing Pharmaceuticals in November 2015*

32.     Plaintiff was hired soon after the Daraprim scandal went public.   Contrary to his public persona, during her interviews with Mr. Shkreli, Plaintiff believed in his stated mission for Turing and what the future would hold.  Mr. Shkreli's stated plan was to invest the profits from the sale of Daraprim into a significant research and development program focused on treatments for rare diseases.  The Company had hired Dr. Eliseo Salinas ("Dr. Salinas") as President of the Company's Research and Development operations and the Company had already identified over a dozen significant research projects in which to invest.

33.     At the start of her employment as CCO, Plaintiff reported directly to Mr. Shkreli.

34.     As CCO of Turing, Plaintiff was responsible for the creation of Turing's corporate compliance program, focusing on the development of policies, procedures and training on risk areas that impact the Company's business and operations.  These responsibilities included the development of policies and training related to sales and marketing activities, development of a code of conduct, and implementation of a whistleblower reporting line and associated investigation process.

35.     Ms. Costopoulos' role at Turing was to support and advise the CEO, the Board of Directors and the senior management team on various activities and to implement the decisions made by the CEO and Board of Directors on behalf of the Company.

36.     In late December 2015 and early 2016, Plaintiff was approached by Mr. Shkreli, as well as and others, including Peter Myall ("Mr. Myall"), Turing's then-Chief People Officer and Head of Human Resources, and Ken Banta, a shareholder of the Company and a personal advisor to Mr. Shkreli, about assuming the General Counsel ("GC") position at Turing, in addition to her role as CCO. Plaintiff was apprehensive about taking the position at first and took time to consider the offer, which she ultimately accepted in February 2016, with no increase in compensation.

37.     In addition to her responsibilities as CCO, the GC was responsible for all legal matters involving the Company (including the pending litigation and investigations resulting from the Daraprim price hike), the management of three additional attorneys (two in the U.S. and one in Switzerland), and oversight of the work performed by outside counsel.

38.     As General Counsel, Plaintiff was expected to regularly attend meetings of the Board of Directors, including regularly scheduled monthly meetings and *ad hoc* meetings, which she attended in person or telephonically. She, as well as Swiss in-counsel and outside counsel, provided legal input and advice to the Board of Directors as a group or to individual Directors on a variety of matters. Plaintiff did not take part in any vote of the Board of Directors, nor did she possess any vested authority to do so.

39.     In her role as both CCO and GC, Ms. Costopoulos also regularly attended Senior Leadership Team ("SLT") meetings, which generally occurred weekly on Wednesday mornings. Prior to his departure, these meetings were chaired by Mr. Shkreli as the Company's CEO. After Mr. Shkreli left the company, Mr. Tilles chaired the SLT meetings.

### C.   Martin Shkreli's Indictment, Conviction and Sentencing

40.    In December 2015, Defendant Shkreli was arrested and indicted for violations of federal securities laws based on allegations that he had run a ponzi-like scheme while working at MSMB Capital Management ("MSMB") and Retrophin.[5]   The allegations centered around Defendant Shkreli's misrepresentations to investors about how well the MSMB and Retrophin funds were performing, and his misuse of Retrophin funds to pay off MSMB investors, to cover personal loans and to pay for a lavish lifestyle.

41.    As a result of the indictment, Defendant Shkreli resigned his position as CEO of Turing in December 2015.  He resigned his position as a Board Director in February 2016.[6]

42.    Barely having emerged out of the quagmire caused by the fallout from the Daraprim price increase, the news of Mr. Shkreli's arrest and indictment was devastating to Turing – both internally and in the public eye.  As the story played out in print, on the internet, and across major news outlets over the course of weeks, Turing's public image was tied directly to that of its founder and CEO.  The viability of the Company was now truly in doubt as Turing became a pariah in the pharmaceutical and business communities.

43.    All sources of new investment dried up overnight, expansion and research and development opportunities disappeared, and vendors and third-parties, such as recruiting agencies, would no longer answer calls, let alone do business with Turing.  Moreover, Perceptive Advisors

---

[5]    Defendant Shkreli started MSMB in 2009 with a childhood friend.  The business model was to short biotech stocks and then trash talk the companies in internet chat rooms.  Retrophin was founded by Shkreli in 2011 under the MSMB umbrella.  Retrophin was run as a portfolio company with an emphasis on biotechnology.

[6]    Prior to his resignation, Mr. Shkreli was one of three members of the Turing Board of Directors – along with Mr. Tilles (Chairman), and Walter Blum ("Blum").  Mr. Blum was the mandatory Swiss representative on Turing's Board.  After Mr. Shkreli's resignation, the Board consisted only of Mr. Tilles and Mr. Blum.

LLC, the Company's second largest shareholder behind Defendant Shkreli, put the Company into default on an outstanding $15,000,000 debt, forcing the Company to pay off the loan as quickly as possible.  The Company was, in no uncertain terms, in financial trouble.

44.   Upon his resignation as CEO, Defendant Shkreli named Mr. Tilles as interim CEO of the Company.  Prior to being named as interim CEO, Mr. Tilles had served the Company as a consultant.  His primary responsibilities were to garner interest in Turing from new investors.

45.   Despite his resignation as an executive officer and director of the Turing Board, Defendant Shkreli never relinquished control or power over the operations of Turing.  As the majority shareholder –controlling over 46% of the voting shares (directly or through proxies) – Mr. Shkreli was able to exert considerable influence over the actions of many individuals employed at or associated with Turing.

46.   Moreover, several employees and executives of Turing continued to pledge their loyalty to Mr. Shkreli, including Mr. Mulleady and others, which provided him a voting majority.

47.   From September 2016 through June 2017, Defendant Shkreli spent considerable effort, as will become evident below, on forcing the nomination and election of new Board Members who were loyal to him and would carry out his vision for Turing – a vision which entailed retaliating against Plaintiff for not being loyal to him.

48.   His anger and frustration that he was not able to control those at the top levels of what he still believed to  be "his company", consumed him.  He became vengeful for the sake of being vengeful, publicly embarrassing himself and Turing.

49.   In June 2017, Defendant Shkreli's trial for securities and wire fraud began in Federal Court for the Eastern District of New York, before Judge Kiyo Matsumoto.  He was found guilty by a Brooklyn Jury on three counts of securities fraud on August 4.

50.     On March 5, 2018 Judge Matsumoto ordered Mr. Shkreli to forfeit $7.36 million in "substitute" assets[7] to the federal government in order to satisfy the forfeiture requirements for the criminal actions that led to his conviction.

51.     On March 9, 2018, Defendant Shkreli was sentenced to seven years in federal prison for defrauding investors. Judge Matsumoto also imposed a fine of $75,000 on Mr. Shkreli, separate and apart from the $7.36 million in forfeitures.

52.     On April 17, 2018, Defendant Shkreli, had who had been in a Brooklyn federal jail since September, was sent to a federal prison in New Jersey to serve the remainder of his seven-year sentence after being denied his request for a minimum-security federal camp.

53.     On April 23, 2018, the Securities and Exchange Commission announced that Mr. Shkreli had agreed to an order that will bar him from the securities industry in order to settle a pending SEC administrative action against him.

### D.     Martin Shkreli's Social Media Obsession

54.     Defendant Shkreli frequently took to various social media platforms to criticize and often attack others.

55.     For example, in September 2016, after Secretary Clinton left a September 11 memorial service due to illness, Shkreli personally tracked her down at her daughter's apartment. As she exited the building, he shouted at her, "Why are you so sick?" and "Go Trump."  He later tweeted "I enjoyed screaming 'why are you so sick' and 'go trump' at @HillaryClinton.  Get well soon bae!"

---

[7] Those assets are: $5 million in cash in an E-Trade brokerage account that previously had secured his release bond; Shkreli's stake in the drug company Vyera Pharmaceuticals; the one-of-a-kind Wu-Tang Clan album "Once Upon a Time in Shaolin"; the Lil' Wayne album "The Carter V"; and a painting by Pablo Picasso.

56.     That same month, still under indictment, Mr. Shkreli raffled off the opportunity for the highest online bidder to punch him in the face.

57.     After months of harassing a female journalist on Twitter, he was banned from the social media site in January 2017.

58.     Before, during and after his trial for securities fraud, Defendant Shkreli has been extremely active on social media – mainly Facebook. He would post 10-15 times a day on occasion.

59.     In early September 2017, Mr. Shkreli posted on Facebook that he would pay $5,000 to anyone who could grab Hillary Clinton's hair while she was on her book tour.  Specifically, he posted:

> The Clinton Foundation is willing to KILL to protect its secrets.  So on HRC's book tour, try and grab a hair from her.  I must confirm the sequences I have.  Will pay $5,000 per hair obtained from Hillary Clinton.

60.     Judge Matsumoto did not believe that the post was protected by the First Amendment, and that "[t]here's a risk that someone may take him up on it."  The government had argued that the message alarmed the Secret Service and that it fit a pattern of veiled threats against female journalists who rebuffed Mr. Shkreli's social media advances.

61.     As detailed below, Defendant Shkreli pursued a similar pattern of social media and email threats and harassment of Ms. Costopoulos.  If an agency as powerful as the Secret Service voiced concern about Mr. Shkreli's threat directed at Secretary Clinton, imagine the impact and distress that continuous threatening emails and Facebook posts had on Plaintiff, who did not have the benefit of any protection, let alone that of the United States Secret Service.

### E.     Defendant Shkreli Legally Barred From Participating in Turing's Business

#### i.     Martin Shkreli's Refusal to Step Away From Turing and His Demand for a Consulting Agreement in Early 2016

62.     One of the first SLT meetings after Mr. Shkreli's resignation took place in January 2016.  Mr. Tilles served as the Chair of the meeting.  Despite his resignation as CEO, Mr. Shkreli had no intention of surrendering control over the business operations and personnel of Turing.  His egoism and boldness knew no bounds. As the meeting was starting, several Turing assistants entered the meeting room and said that Mr. Shkreli was on hold and was waiting to call into the meeting.  The members of the SLT at that time, including Mr. Tilles, Dr. Salinas, Ms. Retzlaff, Mr. Crutcher, Mr. Myall, and Plaintiff, jointly decided and agreed that Mr. Shkreli could not participate in the call because he was no longer part of the management team of Turing.

63.     Upon being informed of the SLT's decision, Mr. Shkreli immediately began calling Mr. Tilles' cell phone.  Mr. Tilles answered the call but was not able to convince Mr. Shkreli that he could not participate in the meeting.  Mr. Tilles, fearful to say no and draw the ire of Mr. Shkreli, handed his phone to Ms. Costopoulos and Dr. Salinas who enabled the speakerphone function on Mr. Tilles' phone.   Dr. Salinas spoke first and began by informing Mr. Shkreli that he was no longer CEO and thus, had no authority to participate in the SLT meeting.

64.     Mr. Shkreli began verbally assaulting Dr. Salinas and the other members in the room, including Plaintiff, stating that the SLT members did not know what they were doing and that he was going to participate in the call no matter what.   Plaintiff informed Mr. Shkreli that since he was no longer CEO, he had no legal right to participate in the SLT meeting nor participate in any of the day-to-day operations of the Company.   Ms. Costopoulos further informed Mr. Shkreli that the Company had made affirmative statements to numerous third parties (*e.g.,* the government, healthcare providers, and consultants, among others) that Mr. Shkreli was no longer involved in the business of Turing. Mr. Shkreli finally accepted this explanation and the call with him was terminated.

65.      Despite Mr. Shkreli's official exit from the Company in December 2015 and from the Board in February 2016, he continued to insert himself in the day-to-day business of Turing. He would call, email or text individuals in the Company to obtain information concerning sales, business development and research activities.  Based on the information he obtained, he would attempt to direct their actions.  He also continued to own or control approximately 46% of Turing's voting shares (either directly or through proxies).

66.      In or around February/March 2016, Defendant Shkreli began to reach out to Mr. Tilles and others at the Company about his desire for Turing to hire him as a business consultant. It was understood by many at the Company that Mr. Shkreli was in need of money to pay for his high-profile criminal defense team.

67.      Mr. Vernick, of the law firm Fox Rothschild, approached Plaintiff about Mr. Shkreli rejoining the Company in some capacity, including as a paid consultant.  Mr. Vernick was Mr. Shkreli's personal attorney through at least June 2017.[8]  Mr. Vernick attempted for several months to obtain the consulting agreement for Mr. Shkreli, continuously stressing the need for the Company to hire his client as a paid consultant.

68.      The very idea of hiring Mr. Shkreli – who was awaiting trial for serious violations of federal securities laws – as a paid consultant, was complicated to say the least.  Plaintiff was first and foremost concerned with the legality of bringing Mr. Shkreli back to the Company, let alone paying him.  She was also concerned about how any kind of involvement by Mr. Shkreli in the Company would be viewed by employees, investigating government agencies, healthcare practitioners, patients, shareholders, potential investors and others in the industry a time where

---

[8]      Plaintiff has been unable to obtain a clear answer as to whether Mr. Vernick or Fox Rothschild continues to represent Mr. Shkreli individually.

Turing's management was attempting to restart relationships with third-parties and reinvent the Company's business and image following the Daraprim price increase and Mr. Shkreli's indictment. Furthermore, there was no business need to hire him and Dr. Salinas made it clear that he did not want Shkreli to work in the research and development area.  To add to the impossibility of this situation, by this time Plaintiff learned that the Internal Revenue Service, the New York State Department of Taxation and several Retrophin Inc. plaintiffs had liens against Mr. Shkreli's assets as a result of his legal difficulties and had approached Turing to inquire of any of Shkreli's assets held by the Company.

69.     Plaintiff, conscious of her obligations to the Company and its shareholders, employed and followed vigorous due diligence procedures, relying on the advice of outside counsel and independent analysis, to the extent necessary, in making informed decisions in the best interests of Turing.  This included doing so in response to Mr. Vernick and Mr. Shkreli's repeated requests.

70.     Ms. Costopoulos consulted with the Board and other management members regarding their opinion concerning the request.  Plaintiff consulted with attorneys from Dechert LLP, the law firm representing Turing in the Congressional investigations and other government inquiries, and ReedSmith LLP[9] ("ReedSmith"), Turing's outside employment counsel, regarding the matter.

71.     As time passed, both Mr. Vernick and Defendant Shkreli became more and more frustrated with Plaintiff – viewing her as an obstacle to Mr. Shkreli obtaining a consulting agreement.

---

[9]     Specifically, Plaintiff worked with Don Innamorato and his colleagues in ReedSmith's Princeton and Philadelphia offices.

72.     Despite continued calls from Mr. Vernick regarding the demand to provide Mr. Shkreli the consulting agreement, many of which were followed up with abusive communications from Mr. Shkreli, Plaintiff maintained her composure and professionalism.  By late April, Mr. Vernick and Mr. Shkreli had apparently lost interest in seeking the consulting agreement and the talks waned until completely ending shortly thereafter.

### ii.     Turing's Culture of Misogyny

73.     It was no secret that Defendant Shkreli was a showman when it came to his public image – whether it be in person or through his social media interactions.  This characteristic became more prominent after all of the attention – both positive and negative – he garnered as a result of the Daraprim price increase and his arrest and indictment.  The internet – including Twitter, Facebook, and media interviews – is rife with examples of Mr. Shkreli taking opportunities to objectify and malign females, whether it be someone famous like Taylor Swift, Hillary Clinton or one of his ex-girlfriends.

74.     Mr. Shkreli fostered and instilled his misogynistic and insulting attitude towards women at Turing.

### iii.     Plaintiff is Forced to Endure the Harassment of Shkreli; Threatens Her Employment at Turing Beginning in September 2016

75.     On September 7, 2016, Mr. Shkreli emailed Plaintiff, Mr. Tilles and Mr. Crutcher impressing on them the fact that they worked for him.  He also appeared to have a crystal ball that foretold Plaintiff's termination *prior to the occurrence of either of the reasons for which she was fired*:

> When I make a request to you, such as potentially adding Directors to this maligned company, your job is to help me process it, not to gossip to other shareholders about it.
>
> *I can't wait until you are all gone – it will not be long.*

(Emphasis added).

76.     On this email, Mr. Shkreli copied Mr. Vernick, his personal attorney, and now the purported "independent" outside counsel for the Company.

77.     In a text message exchange with Mr. Crutcher and Mr. Tilles on September 14, 2016, Mr. Shkreli threatened to go to the Wall Street Journal and Twitter because Plaintiff had not responded to his harassing emails and requests:

> We haven't heard from eve.
> I'm going to the Wall Street Journal and Twitter, I've had enough.
> This is going to get so much worse.

78.     On Friday, September 23, 2016, Mr. Shkreli emailed Plaintiff and Mr. Tilles stating:

> We're suing you, Eve and Walter [Blum] for fraud.

79.     The accusatory nature and harassing emails continued on September 26, 2016 when Defendant Shkreli wrote to Plaintiff, Mr. Tilles and Mr. Vernick (copying Mr. Crutcher and Mr. Smith):

> You are telling investors there is a Canadian company interested in buying Turing, but you have not told me? Rigging a vote?
>
> Pathetic!  I can't believe I called you guys my "partners"

80.     The threats continued on September 29, 2016 in an email from Mr. Shkreli to Plaintiff and Mr. Tilles which stated: "[t]he Southern District of New York authorities are but a phone call away!".

81.     Later that same day, Mr. Shkreli wrote to Mr. Tilles and Plaintiff stating that "[d]o you really think I can't get to 50%?  What is wrong with you?"

82.     On October 6, 2016, Mr. Shkreli emailed Plaintiff that he was "[l]ooking forward to terminating all of you" (referring to Plaintiff, Mr. Tilles and Mr. Zyngier).

83.     Defendant Shkreli's harassment and attacks began to take a toll on Plaintiff's professional and personal life.

**F.      Shkreli's Harassment and Threats to Plaintiff Throughout 2017 Rise to the Levels of Defamation and Tortious Interference With Contract**

84.     As set forth above, Defendant Shkreli continued the campaign of harassment directed at Ms. Costopoulos that he had started in late 2016.

85.     By January 2017, the attacks became more frequent and abrasive.  While several of his more harassing emails are still available for reference herein, unfortunately, many of Mr. Shkreli's public Twitter attacks directed at Plaintiff and others, which occurred prior to January 2017, are inaccessible and unavailable.[10]

86.     On January 23, 2017, Mr. Shkreli emailed Plaintiff, stating:

Lol.  You're only making it worse.  The shareholders want you out. Listen to them.

87.     Later that same day, Defendant Shkreli emailed Plaintiff (copying Mr. Tilles, Mr. Crutcher and Mr. Smith), threatening an investigation and criminal allegations:

Hi Eve,

I just want you to know that when the new directors join, I'm going to ask them to conduct a full investigation of your shenanigans.  I will implore them to initiate litigation against you.  I hope the new directors will listen.  I am also asking my attorney [Mr. Vernick] to notify the DOJ that there may be some criminal misconduct at Turing involving you.  I'm sorry management "lost" in this election, but arbitrarily delaying the election is criminal and I would imagine others would agree.

---

[10]     This is because the popular social media site banned him and locked his account after he had been consistently harassing a female journalist on Twitter.

88.     This message took an emotional toll on Plaintiff and caused her much concern and anguish. These threats, from an individual who Plaintiff understood all too well was known to be erratic and unpredictable, were worrisome to her to say the least. Despite his resignation as CEO in 2015 and member of the Board in 2016, Mr. Shkreli still exercised considerable control over the Company and had the support of many who were still employed by Turing.  Plaintiff felt that she had absolutely no recourse and could only question why Defendant Shkreli appeared to be blaming her, the Company's GC, for decisions made by and actions taken by the Board of Turing.

89.     On February 6, 2017, Mr. Shkreli sent a particularly threatening email to Jeff Kochian ("Mr. Kochian"), an attorney at Akin Gump.  The Akin Gump firm had been retained by the Turing Board of Directors after Alex Zyngier ("Mr. Zyngier") joined the Board.  Copied on this threatening email, among others, were Mr. Tilles and Mr. Vernick.

> The EGM has to be done within 20 days, so we are litigating immediately, even if there is no "upside" in getting it scheduled sooner.  This will wake up authorities to Turing's wanton abuse of corporate law and avoidance of shareholders' will.  I have heard other shareholders will be putting forth EGM requests requiring Ron's removal from the BOD.  It's game over – 90% of shareholders want an end to this madness.  The fact that this divisive group has a firm consensus on this matter is telling.
>
> ***Attempts to disrupt the natural order of law will be met by fierce opposition when it is all over.  If my BOD slate prevails (and I think you know it has), I will ask them to litigate against Tilles and Costopoulos and assist the SDNY in a criminal investigation.  I will implore the BOD to claw back any compensation and use the 'faithless servant' doctrine in Delaware to ensure you are not indemnified in any way.***
>
> ***The only possible settlement I could even remotely consider would include Ron and Eve's immediate resignation.***  I don't want cash and I will never, ever give up my shareholder rights.  Your missive is nonsensical and shareholders simply don't believe you – but you already know that, as you have seen the results of the vote: you lost.  ***Don't turn a bad situation into a grave one.  I am embarrassed that I ever placed my trust in such a group of sorry miscreants.***

(Emphasis added.)

20

90.     This email is shocking to say the least. Mr. Shkreli not only makes direct baseless threats towards Plaintiff's well-being, both financial and to her reputation, but once again he is foreshadowing his ultimate goal of having Plaintiff fired without being given her rightful compensation.  Mr. Shkreli carried through on this threat when his hand-selected Board and Mr. Vernick, his personal attorney and now the Company's corporate counsel, terminated Plaintiff's employment, for Cause, in July 2017.

91.     This threatening email again resulted in considerable mental strain and anguish for Plaintiff at the hands of Defendant Shkreli, Turing's largest shareholder and puppet-master of many of Turing's executives.

92.     On February 17, 2017, Mr. Tilles forwarded an email to Plaintiff dated that same day that Mr. Shkreli had sent to attorneys at Akin Gump and Mr. Tilles.  The original email copied Mr. Vernick, who, at this point, had been involved in carrying out and assisting with Defendant Shkreli's attacks on Plaintiff for over a year.   The email from Mr. Shkreli stated:

> I'm writing this Facebook post – let me know if you have any edits or suggestions – I plan to post this Monday morning and give the media a heads up this weekend. Regarding my 'title' I simply haven't used facebook much since I was banned from Twitter – I finally have had the chance to update my title.  I apologize for any confusion!  ***Having said that, I am the Founder of Turing, and I hope you enjoy the last fraudulently obtained days of employment at my company.***
>
> > I have filed a lawsuit in Switzerland against Turing Pharmaceuticals. The company I founded has "delayed" the meeting I called to kick out the hated CEO, Ron Tilles.  I think the company waited until the last minute to "reschedule" the meeting because they realized they lost the vote.  Shareholders overwhelmingly dislike Mr. Tilles (especially his alleged spending habits) but he refuses to leave.  ***I'm also suing Ron Tilles and Eve Costopoulos for fraud – that complaint is being drafted as we speak – it is very juicy and hopefully will be filed later this month.***

(Emphasis added.)

93.     The threats and attacks were becoming unbearable and abusive.  Remarkably, they were ultimately carried out in July 2017 when Mr. Shkreli, Mr. Tilles, Mr. Mulleady and Mr. Vernick orchestrated Plaintiff's termination.

94.     On February 20, 2017, Defendant Shkreli followed through on his promise to air his grievances publicly – this time on Facebook to his over 95,000 followers:

> On 9/23/16, I asked Turing Pharma to appoint new individuals to the Board of Directors.  The company scheduled that vote for 1/25/17, in violation of all common sense and law.  The vote went resoundingly in favor of my candidates.  The day before the vote was schedule to be tallied, Turing delayed the meeting to May 2017 to avoid their fate!  ***Now the company, under the leadership of Ron Tilles and Eve Costopoulos, is trying to perpetuate their highly paid salaries while shareholders are nearly unanimous that they have to go.***  Mr. Tilles gave himself a raise to $600,000 – when I was CEO I took no salary.  Perhaps angry activists should look at Ron Tilles and his actions.
>
> Today, I filed suit in Switzerland for the rapid convening of an extraordinary general meeting to end this 'reign of terror'.  ***I will be following up with a fraud law suit against Tilles and Costopoulos – we have uncovered various sordid actions which will be punished.***

*See* Martin Shkreli Facebook Page, February 20, 2017. (Emphasis Added).

95.     This public post on Defendant Shkreli's Facebook wall could be viewed by any member on the social media platform (not just Mr. Shkreli's 95,000 followers).  The post received 869 reactions, 58 separate comments and several replies.  Some of the comments and replies referred to physical harm being inflicted on Ms. Costopoulos.

96.     The impact and results of Shkreli's internet antics and public postings should not be taken lightly.  Judge Kiyo Matsumoto, U.S. District Court Judge in the Eastern District of New York, surely did not when Shkreli offered $5,000 to anyone who could grab him one of Hillary Clinton's hairs while she was on a book tour.  The Judge determined that Shkreli was a "danger to society" and worried about his influence on his Facebook followers.

97.    Defendant Shkreli's public humiliation and defamation of Plaintiff continued to take a toll on her well-being and damaged her reputation and standing in the pharmaceutical and legal communities.  The statements themselves are false and without basis – including those regarding any "fraud" or "sordid actions" engaged in by Plaintiff.

98.    Defendant Shkreli once again, on April 19, 2017, threatened Plaintiff's employment in an email that was sent to Plaintiff, Mr. Mulleady, Akeel Mithani ("Mr. Mithani"), Jordan Walker ("Mr. Walker"), Edward Painter ("Mr. Painter"), Dr. Salinas, Mr. Crutcher, Mr. Smith, Lukas Dascher (Swiss in-house Counsel), Mr. Zyngier and Mr. Kochian at Akin Gump. Also copied on the email was Shkreli's personal attorney, Mr. Vernick (included on the "To" line as "Scott").  The email stated:

> Are you going to honor the results of *this* election when you lose?  We are sending 53% of the votes in today to end this charade – don't get too attached to the office furniture.

Emphasis in original.

99.    On May 9, 2017, Mr. Shkreli took to Facebook once again to rile up his followers, informing them that Plaintiff would be going to jail:

> I honestly think Eliseo Salinas, Eve Co[n]stopolous, Alex Zyngier and others will go to jail over this.

*See* Martin Shkreli Facebook Page, May 9, 2017.

100.    This public post garnered 47 reactions and 12 comments – one of which inquired whether Mr. Shkreli wanted "Thot Patrol[11]" to be dispatched to take care of ***these people***.  It was clear that Defendant Shkreli was engaging in this behavior to intimidate Plaintiff.

### G.    Shkreli Solidifies Control of Turing's Board of Directors

---

[11]    "THOT" is a slang term which stands for "That Ho Over There."

101.     On June 21, 2017, the Turing Board held a shareholder meeting to vote on new proposed members to the Board.

102.     The Company had proposed the election of Dr. Salinas, Zsolt Lavotha, and Richard Berman to the Board of Directors.

103.     Mr. Shkreli had proposed the election of Mr. Mulleady, Mr. Painter, Mr. Mithani, Monica Richardson and Mr. Walker to the Board of Directors.

104.     As a result of the June 21 vote, Mr. Shkreli's slate was voted onto the Board of Turing, which now consisted of Mr. Zyngier, Mr. Blum, Mr. Tilles and Defendant Shkreli's slate of five individuals.

**H.    Plaintiff is Placed Under Investigation and Placed on Leave**

105.     On June 22, the new Board of Directors of Turing convened its first meeting, which was conducted telephonically.

106.     At the start of the meeting, Mr. Vernick joined and informed the Board and those attending that he would be acting as legal counsel to the Company moving forward.

107.     At the meeting, Mr. Vernick and Mr. Tilles recommended that Plaintiff be placed on administrative leave pending an investigation into misconduct into ordering the destruction of certain documents.

108.     On the evening of June 22, 2017, Mr. Mulleady and Mr. Mithani, two of the newly elected board members, met with Ms. Costopoulos at the Company's offices and told her that she was being placed on paid administrative leave pending an investigation. Plaintiff was provided a letter signed by Mr. Tilles stating:

> This letter will serve as notice that the Board of Directors of Turing Pharmaceuticals, LLC's (the "Company") has decided to place you on administrative leave of absence, effective immediately, pending a determination regarding your continued employment.

109.     Such an extraordinary and surprising course of action was unprecedented at Turing. In the past, neither allegations of sexual assault and harassment, nor allegations of embezzlement and inappropriate conduct by an executive warranted the exceptional recourse by the Company of placing the subject of the investigations on administrative leave.

110.     In fact, during Plaintiff's time at Turing, not one individual had been placed on leave pending the separate investigations the Company had conducted into their alleged inappropriate, harassing, or illegal behaviors.

111.     Later that evening of June 22, the Company sent a letter to all Turing employees, from Fazela Mohamed (Director of Human Resources), on behalf of Mr. Mulleady and Mr. Mithani, which stated:

> Effective immediately, the Company has placed CEO and President of R&D, Eliseo Salinas and SVP & General Counsel, Eve Costopoulos on administrative leave pending the outcome of an investigation.

112.     This memorandum was yet another example of the Company's retaliation against and unfair treatment of Plaintiff. No former employee was ever the subject of a company-wide memorandum announcing that they had been placed under investigation and on administrative leave for the conduct in which they were alleged to have engaged.

## I.     Plaintiff Has No Choice but to Resign for "Good Reason"

113.     On July 20, 2017, Ms. Costopoulos, pursuant to her Employment Agreement, resigned from her position at Turing for Good Reason, providing the following justifications for doing so:

- As of June 23, 2017, Ms. Costopoulos' duties as Chief Compliance Officer and General Counsel were completely stripped from her, constituting a material diminution of her authorities and responsibilities at Turing;
- The diminution of Ms. Costopoulos' duties, responsibilities and authorities was and remains without any proper justification;

- Ms. Costopoulos was never given any notice of the actions underlying "Cause" or given the opportunity to cure said actions;
- Ms. Costopoulos has been subjected to a continued pattern of harassment in material breach of the Agreement.  Certain instances of harassment have detailed internal company business, which has been broadcast via social media and over Company email;
- This harassment is the result of the culture of disrespect and mistreatment fostered by Turing and its new Board of Directors, those that control said individuals, as well as Turing's outside Counsel (certain of whom were copied on the harassing communications, and are now responsible for leading the "investigation" to which Ms. Costopoulos is being subjected);
- Ms. Costopoulos has been slandered and defamed publicly in material breach of the Agreement;
- Ms. Costopoulos has been the subject of gender-based discrimination by the Board and the Company in material breach of the Agreement;
- The carrying out of a biased, sham investigation on behalf and at the behest of the perpetrators of much of misconduct referenced herein; and
- The continuous mistreatment and retaliatory actions by the Company and certain members of the Board of Directors for carrying out her stated duties called for by her position with the Company.

### J.    The Company Terminates Plaintiff's Employment For Cause

114.    Just four days after the Resignation for Good Reason, Mr. Vernick forwarded a letter terminating Plaintiff, for Cause, under the terms of the Employment Agreement.

## II.    <u>DAMAGES</u>

115.    As a direct and proximate result of Defendant's misconduct, Plaintiff has suffered monetary economic damages, including punitive damages.

116.    In addition, as a direct and proximate cause of Defendant's misconduct, Plaintiff has suffered non-economic harm for which she is due compensatory and other damages.

117.    Defendant's misconduct has caused Plaintiff to experience periods of anxiety, sleeplessness, and emotional distress.  As a result of Defendant's continued harassment, Plaintiff has difficulty focusing and concentrating and her home and family life have been impacted by her state of mind.

118.     Plaintiff has feared for her financial stability as a result of Defendant's continued threats culminating in their retaliatory actions carried out against her.

119.     Moreover, Plaintiff has feared for her physical well-being as a result of the public remarks made by Defendant Shkreli and the public reactions to those comments.

120.     Plaintiff has been forced to expend considerable time and money on medical treatment, most notably continuing psychotherapy.

121.     As a result of Defendant's actions, Plaintiff's reputation has been irreparably damaged and Plaintiff's ability to secure future employment has been severely hindered.

## CAUSES OF ACTION

## COUNT I

## DEFAMATION

122.     Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

123.     The above-described conduct of Defendant Shkreli constitutes defamation under New York Law.

124.     As set forth above, Defendant Shkreli made a series of false statements pertaining to Plaintiff to a third-party (namely the public who has access to Facebook), without privilege or authorization, which has resulted in harm to Plaintiff.

125.     As a direct and proximate result of Defendant Shkreli's defamatory conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

126.     Defendant Shkreli's unlawful defamation constitutes malicious, willful and wanton violations of law and principles of equity, for which Plaintiff is entitled an award of damages.

## COUNT II

27

## TORTIOUS INTERFERENCE WITH CONTRACT

127.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

128.    A valid Employment Agreement existed between Plaintiff and Turing.

129.    Defendant Shkreli knew of the existence of Ms. Costopoulos' Employment Agreement with Turing.

130.    As set forth above, Defendant Shkreli intentionally and, with malice toward Plaintiff, caused Turing to breach their contractual obligations to Plaintiff.

131.    As a result of the breach, Plaintiff has incurred damages, which include, but are not limited to, economic loss.

132.    As a direct and proximate result of Defendant Shkreli's tortious conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendant, containing the following relief:

A.      An award of damages to be determined at trial, plus pre-judgment interest, to compensate for all monetary and/or economic damages;

B.      An award of damages to be determined at trial, plus pre-judgment interest, to compensate for all non-monetary and/or compensatory damages, including but not limited to damages compensation for her mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering and emotional distress;

C.      An award of costs that Plaintiff has incurred in this action, including but not

limited to, expert witness fees, as well as Plaintiff's reasonable attorneys' fees and

costs to the fullest extent permitted by law and equity; and

D.      Such other and further relief as the Court may deem just and proper.


**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.


Dated: May 3, 2018

New York, New York


                        Respectfully submitted,



                        By:   _/s/ *Daniel B. Rehns*_____
                              Daniel B. Rehns
                              Frank R. Schirripa
                              **HACH ROSE SCHIRRIPA & CHEVERIE, LLP**
                              112 Madison Avenue, 10th Floor
                              New York, New York 10016

                              *Counsel for Plaintiff*